THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JULIA E. BARRINGER, Appellant.

*Criminal prosecution — written instrument — parol evidence in explanation of.*

In criminal prosecutions, the rule which prevents proof of conversations and agreements made prior to the execution of a written instrument to explain the object of the instrument, does not apply.

The defendant in such a case cannot be precluded from showing that felonious intent did not exist, simply by the production of a paper wherein she has writ-

ten or signed something inconsistent with her claim of the non-existence of the felonious intent. She is not estopped by such writing.

The jury have a right to consider the writing in determining the question of credibility of the witnesses, and there is no ground in such a case for the application of the rule that parol evidence cannot be offered to rebut the claim of felonious intent.

APPEAL by the defendant, Julia E. Barringer, from a judgment of the Court of Sessions of the city and county of New York, rendered against said defendant on the 14th day of August, 1893, convicting her of grand larceny in the first degree, and also from the order denying defendant's motion for a new trial.

*W. T. Jerome,* for the appellant.

*J. D. Lindsay,* for the respondent.

VAN BRUNT, P. J.:

The defendant was charged in the indictment with grand larceny, there being two counts. The first charges her with the felonious appropriation of the sum of $2,000, the property of one Zacharias V. Spinosa, in her possession, custody and control as bailee; and the second charges her with feloniously taking, stealing and carrying away the same sum belonging to said Spinosa. Evidence was given upon the part of the People and upon the part of the defendant, and the jury having rendered a verdict of guilty of grand larceny in the first degree, from the judgment thereupon entered this appeal is taken.

Upon the part of the People the complainant was examined as a witness. He testified that he was a teacher of languages, living at 75 East One Hundredth street in the city of New York in May, 1891, and that at that time he saw an advertisement in a newspaper relative to some business opportunity. The complainant answered the advertisement in writing, and subsequently called upon the defendant, at No. 10 East Fourteenth street, and met there the defendant and her husband; a conversation was had to the effect that she wanted somebody to help her in her business as a bookkeeper; that she had been imposed upon by several other people and needed somebody in whom she could trust, and that she required at the same time a deposit of $2,000 or $3,000 as security. He told

her he would consider it and went home. The second time the defendant sent for complainant and he went back three or four days afterwards. At this time she said that if he would remain there she would give him half the profits of the business carried on in the house, and that the money complainant advanced would be returned at the end of twelve months in a lump. The complainant replied that he had determined not to give the $3,000 as security, but he would not mind making an experiment for twelve months and would give her a security of $2,000. This was accepted and an agreement was drawn up by Mr. Smith, a brother of the defendant, who was present at the trial.

The agreement was as follows:

"*Articles of Agreement between Julia E. Barringer, of the City and County of New York, of the first part, and Zacharias V. Spinosa, of the City and County of New York, of the second part.*

"The party of the first part, in consideration of the sum of $2,000 to her paid in hand as hereinafter provided, covenants and agrees to take the party of the second part into her service at No. 10 East 14th for the term of one year, beginning from this date, and it is left to the pleasure of Mr. Spinosa to continue rendering his personal services, and it is further agreed that at the expiration of nine months from this day either party of this contract shall give notice to the other if the cancellation of this agreement is desired, and the party of the second part shall be entitled as pay for his said services one-half of the net proceeds arising from the commission business carried on at No. 10 East 14th street, city of New York, under the name of the party of the first part. The said amount of $2,000 to be returned to the second party in a lump at the expiration of the contract

"The party of the second part, in consideration of the interest given to him as herein provided, covenants and agrees to pay to the party of the first part $500.00 (five hundred dollars), on the signing and execution of this instrument and $1,500 (fifteen hundred dollars) more in three different payments at $500 each (until the sum of $2,000 is paid) at such times as may be required by the party of the first part during the term of the agreement as above specified.

"In witness whereof, the parties hereunto have set their hands and seals the eighth day of June in the year one thousand eight hundred and ninety-one.

"JULIA E. BARRINGER,

"ZACHARIAS V. SPINOSA."

This was signed and executed by the parties in the presence of Smith, who had drawn the same up. Pursuant to this agreement the complainant paid the defendant $500, and four or five days afterwards made the next payment of $500, and three or four days after that a payment of $1,000. After the agreement the complainant went to defendant's in accordance therewith, to see what services he could render. The defendant asked him to copy certain chattel mortgages, which she drew with his name inserted as the mortgagee. The complainant said he did not like to have his name in those papers, and she said he need not fear, that his name would not be made public, that she could not insert her own name because she was the broker, and if she inserted her own name it would be usury, but that she as a broker could charge any brokerage she liked. He made out seven or eight of these mortgages, which the defendant kept. The complainant did not keep any of them in his possession. This was all the bookkeeping he did. At the end of three weeks the complainant was introduced to a gentleman by the name of Armelia Castilo by the defendant, she saying "Here is a friend of mine, Mr. Castilo; he is a partner of mine." The defendant told her afterwards that he would be entitled to half the profits she was making with him as a special partner; she said, "No, I would not be entitled, because he would be a different partner from me."

"By THE COURT: Q. He was a different partner? A. Yes, sir; I said no; that I was nothing but her bookkeeper there; that I was entitled to half the proceeds of the business carried on in the house, according to the agreement, and that I could not be a partner, because I was nothing but a bookkeeper, and she had my money as security. She said then that the contract was wrong, and that it would be altered. I said if the contract was wrong, and had to be altered, that the money had to be returned to me after that, and we could see what new arrangement we could make. She said no, she wouldn't give me the money back, but she would make a verbal contract, allowing me $40 a week for the use of the $2,000. She

asked me if I wouldn't be contented with that. I said : 'No, that would be usury ;' I would stick to the contract to give me half the profits of the business carried on in the house." After that the complainant went to see his lawyer, and subsequently went to see the defendant, and tried to get as much money as he could out of her by way of profits. After certain negotiations he got fifteen dollars a week on account of profits for two or three months from the latter part of August until the end of November, 1891. The complainant further testified to giving the notice under the contract, and that the $2,000 was never returned. On cross-examination it appeared that the complainant had brought an action in the Supreme Court to recover the amount claimed to be due. In his complaint he swore that he had given the defendant $2,000 and received back $642, leaving a balance of $1,358. It further appeared that in June he had received certain other sums of money, and the complainant further testified that the $2,000 was to be given as security. It further appeared that in addition to the mortgages testified to as being taken in the name of Spinosa, he received a number of notes which were held by him, and which were taken in the business carried on by the defendant.

Upon the part of the defense the husband was examined as a witness. He testified as to the negotiations between the complainant and the defendant, and to certain conversations in regard to the form of the agreement, and that the complainant was to advance the money to put into the business, and that he stated how he wanted the money invested — that the mortgages were to bear six per cent interest and to be taken in his name, and that he was to have half of the brokerage. The defendant was also examined on her own behalf, to the effect that he had $2,000 to invest, and that the money was to be invested on chattel mortgages on furniture, and the notes and mortgages were to bear six per cent interest, and he was to have that, and that she was to charge thirty per cent commission, the half of which was to go to the complainant.

The defendant also offered as a witness William J. Smith, who drew the agreement, and he testified that at the time, or just before it was signed, he heard a conversation between the defendant and the complainant, and when asked to state what it was at the time or immediately before, the court asked whether it was for the purpose

of modifying or changing anything. The defendant's counsel stated that he proposed showing what the conversation was, and the court replied that he would not allow him to introduce any evidence to contradict the paper. The defendant's counsel stated that he proposed to show that at the time, or immediately before it was signed, that defendant objected to the word "service" in the agreement, and that the complainant insisted upon its going in there, and the court refused to allow the evidence. The defendant's counsel insisted upon the right to show what was the understanding and agreement, and what was said in connection with the contract and what led up to it. The court refused to allow the evidence. The defendant's counsel then asked: " Q. At the time this contract was signed was there anything suggested by Mr. Spinosa about avoiding the usury law? A. Yes, sir. Q. Now, what did he say in regard to avoiding the usury law? A. He said that he put that word ' service ' there to evade the usury law, to get around it, something like that ; that is what he said.

" THE COURT.— And then it was signed with that understanding? A. Yes, sir.

" THE COURT.—And, therefore, the defendant in this case entered into an agreement to violate the statute by evading the usury law, so that one was about as bad as the other."

The defendant's counsel then asked: " Did you hear any conversation immediately before the signing of this, or some time before between these two, as to what was to be done with this money? " This was excluded upon the ground that all conversations and all agreements are supposed in law to be merged in the written agreement, and an exception was taken.

It is urged upon the part of the defendant that this was error. The complainant had been allowed to testify as to the conversation which led up to the agreement, and the purpose for which the contract was entered into. It is true that no objection was taken to this. The defendant and her husband had also been examined on this point, and had testified. It further appeared from the testimony that Smith was present at the time of the execution of this agreement, and at the time it was drawn up. And notwithstanding this condition of the testimony the court refused to allow the witness Smith to testify upon the same subjects in respect to which the

other witnesses had been examined. And the question submitted to the jury was, whether this money was given to the defendant by the complainant as security, and the jury were instructed that if the defendant received it upon that understanding, and then with intent to deprive the complainant of its possession she used it for any other purpose than as security for his good conduct, and appropriated it to her own use, she was liable to be convicted, under the indictment, of grand larceny in the first degree. The jury were further charged that in determining to whom they would give credence they should take into consideration the written agreement, and although any subsequent agreement in reference to the transaction might be made orally or by parol, no prior conversations or transactions were permitted to contradict or impeach the written contract. The court was further asked to charge the jury that if they found upon the evidence that at the time the complainant delivered the money to the defendant it was agreed that it should be invested in chattel mortgages and the profits divided, and it was so invested, then the defendant should be acquitted. The court replied : " I have charged that substantially, and I refuse to charge other than I have charged." The question thus submitted to the jury was as to the circumstances under which this money was paid, and, as already stated, evidence had been given both on the part of the People and the defendant as to the circumstances which led up to this agreement. The agreement itself shows nothing in regard to the purposes for which the money was to be given. It is true that it says that the complainant was to be entitled to half the profits for his services, and that the amount of $2,000 was to be returned in a lump at the expiration of the contract. But the agreement is not of that definite and explicit character as to deprive the defendant (even as between the parties) of the right to give testimony as to the purposes for which the money was to be used. And it is clear that in the case of a criminal prosecution the rule applied by the learned recorder cannot prevail. The question is as to the felonious intent of this defendant; and she cannot be precluded from showing that such felonious intent did not exist simply by the production of a paper wherein she has written or signed something inconsistent with her claim of the non-existence of the felonious intent. She is not estopped by any such writing. The

jury have a right to consider the writing in determining the question as to the credibility of the witnesses, and the weight to be given to the testimony, but there is no ground in a case of that description for the application of the rule that parol evidence cannot be offered to rebut the claim of felonious intent.

The defendant, therefore, had a right to the testimony of Smith for the purpose of showing that it was the understanding of the parties at the time this money was delivered that it was to be invested in chattel mortgages and not to be held merely as security.

For this error, we think, the judgment should be reversed and a new trial ordered.

O'BRIEN and FOLLETT, JJ., concurred.

Judgment reversed and new trial ordered.